### ROGERS v. MACBETH.

(Supreme Court, Appellate Division, Second Department. January 10, 1908.)

1. NEW TRIAL—GROUNDS—INSUFFICIENCY OF EVIDENCE.
    A trial court, holding the opinion that the evidence is wholly insufficient to sustain the verdict, cannot deny a new trial on the ground that another jury may award heavier damages.

2. MASTER AND SERVANT—INJURY TO SERVANT—NEGLIGENCE—EVID[
FICIENCY.

In an action for injuries to an employé, engaged in the manufa
fuses to explode dynamite cartridges, in consequence of the explosion or
fuses, evidence *held* insufficient to support a verdict for plaintiff on the
ground of negligence in failing to inform plaintiff of the danger of the
occupation.

Appeal from Trial Term, Queens County.

Action by Charlotte Rogers against James Macbeth, doing business
under the name of James Macbeth & Co. From a judgment for plain-
tiff, and from an order denying a motion for a new trial, defendant
appeals. Reversed, and new trial granted.

Argued before WOODWARD, JENKS, HOOKER, MILLER,
and GAYNOR, JJ.

William A. Moller (Henry Yonge, on the brief), for appellant.
William W. Gillen, for respondent.

JENKS, J. In this action the servant recovered a verdict of $5,000
for personal injuries due to her master's negligence. The court de-
nied the motion for a new trial for the reason that it was powerless
to dismiss the complaint absolutely, and that it was convinced that any
new trial might cast heavier damages upon the defendant. The court
thought that no other jury could be more intelligent or more conscien-
tious, and therefore that any jury would err as did this jury in framing
some occult theory whereby out of pity it would mulct the master in
damages. The court made this disposition of the motion, although it
expressly said that it was not conceivable that 12 sane men could find
it possible that a servant like the plaintiff could under her conditions
be so ignorant of the work she was doing and its peril, or that the mas-
ter could be so indifferent of the safety of his servant and and her
fellows and of his own interest, as to permit her to work for him in
ignorance of the perils. The court stamped the plaintiff's story as
unreasonable, improbable, unbelievable. This deliverance came from
a judge strong at nisi prius, of wide experience, of great wisdom and
sound common sense, one who did not jump at conclusions, who held
his temper under complete control, and who had withal warm sympathy
for his fellowmen. I cannot but feel that this disposition of the motion
was paternalism foreign to judicial function. If the defendant chose
to hazard another trial, it was not for the court to seek to save him
from himself by withholding from him that which the court thought
he was entitled to receive. The court could not even forecast the final
issue, and its disposition of the motion was rather upon the theories of
Gustave Le Bon ("The Crowd," p. 170 et seq.) than upon an exercise
of the judgment required by the law. Even sympathy does not hold
equal sway with every set of 12 indifferent men sworn to make true
deliverance upon the evidence.

I have read this record, of course, mindful of the trial court's opin-
ion, but I think not dominated by it, and I have arrived at the conclu-
sion that the judgment should not stand, in that it is against the weight
of the evidence. The servant complained of many shortcomings of
the master which were asserted to be negligence; but the court with-

on submitted the case to the jury upon the question whether ntiff was informed of the inherent danger of her occupation. The defendant manufactured fuses to explode dynamite cartridges used for blasting. The plaintiff, an intelligent woman of 20 years, was in his service for a year. For a time she worked in the box department, later in the wire department, and for the last three months of her term at a paraffine table. The fuse consisted of a brass shell in circumference smaller than a common lead pencil made elsewhere. This shell was charged with fulminate of mercury, and attached to the cartridge thus made was a wire, which served to connect the cartridge with an electric battery, which exploded the cartridge when the cartridge had been placed inside of the dynamite bomb used to fire a blast. Fulminate of mercury was kept wet and packed in sawdust in the defendant's yard, and only so much as was immediately needed was brought into a room of the defendant's factory. The cartridges were charged in that room by the foreman or superintendent of the workmen and her assistant. Then they were taken into another room and given 100 at a time to the filling girl or girls. The filling girl sealed the cartridges, putting tight onto each one an iron disk, block, or plug, and then poured over this disk hot sulphur, which also served to set and to hold fast the wire. It then became the duty of another set of employés to fetch the cartridges to a table called the paraffine table and there to dip each one into heated paraffine. This was to make the cartridge waterproof. Before applying paraffine, the employé was required to pick off with her finger any superfluous bits of sulphur from a cartridge, in order, I take it, to present a smooth surface for the paraffine application. This plaintiff was at the paraffine table, and the work last described was her work. It appears that on the day in question there was an explosion of the cartridges at or near or on her table, and in consequence the plaintiff lost one eye and suffered impairment of the other.

There are two versions as to the cause of the explosion; but the learned court did not attach vital importance to the determination of the truth of either version, for it instructed the jury that, if the plaintiff was totally uninformed of the inherent danger of the master's business, her recovery did not depend on the determination of the truth as between the two versions. I shall discuss these versions later. It suffices now to state that there is no contention that the explosion was due to any act of the master or of any other one of his servants, but that the explosion was due to the handling of a cartridge or of cartridges by the plaintiff herself. Her testimony is that, when she was transferred to the paraffine table, Elizabeth, the foreman or superintendent, said to the plaintiff that she was going to put her upstairs, and told Miss Donovan, a young woman in the paraffine department, "Nellie, you learn Lizzie how to paraffine." The plaintiff testifies that before that time Miss Hart had never informed her of any danger of the employment, or of any danger that might be incurred at the paraffine table. She further testifies that she only knew that the place was called an electrical shop, that she never knew what the fuses were, that she never had made inquiry as to their use, and that she never had discussed their use with any of her fellows, nor they with her. She tes—

tifies that she had no idea that there was any explosive used in these cartridges, that she never asked any question about them, that it never occurred to her that a cartridge was dangerous, and that she never thought anything about it. She also testified that she had never heard any sound of explosions in the place. She was shaken on her cross-examination to the extent that she admitted that she knew that they must not touch the cartridges on the filling table, and that there had been a discussion among the women of there being danger in the shop, and, although there was nothing said about the danger being due to the use of explosives, she did not know just what it was. Her witness Donovan, who, the plaintiff says, was her instructor at the paraffine table, testifies that she did not warn the plaintiff that there was any danger in the work. Indeed, she testifies that she had no idea of what she was working at—not the slightest; that there never was talk of danger among the workmen; that she had not the remotest idea for what the fuses were used; that she did not know what a fuse was, or what a cartridge was; that she had never heard even of a rifle. Another witness of the occurrence was almost equally ignorant, and, like the plaintiff, had never heard any explosions.

The defendant had closed out all of his interest in the business before this trial. I note this fact for the reason that of all the witnesses called by him, save Elizabeth Hart, of whom many were fellow servants of the plaintiff, none were subject to the criticism that she was testifying for her employer. Miss Elizabeth Hart, employed for 15 years and superintendent of the fuse department, employed the plaintiff. She testifies that she told the plaintiff of the character of the place, that they were making fuses to blast rock, and that her work was dangerous and very dirty; that she must use great caution; that no "fooling" and no conversation was allowed while they were at work, and, moreover, when she transferred plaintiff to the paraffine table, she told her to be very careful not to strike the cartridges against the drip pan or the paraffine pot, otherwise they might explode—to use them gently; that she thus warned every girl about the explosive work; and that once, when Miss Remsen, a fellow servant, had complained of the plaintiff for carelessness while at work at the packing table, she had warned plaintiff not to pound the fuses into the box with her elbow, for they might explode. She also testifies that they make tests of the fuses in the yard at least twice a week, and that the explosions therefrom could be heard all over the place. The witness Mrs. Cannon corroborates Miss Hart, in that she heard the latter caution the plaintiff about care in packing the cartridges, saying that there were explosives in the cartridges. Miss Remsen, the complainant who caused Miss Hart to speak to the plaintiff, corroborates both witnesses in this respect. Miss Sewley heard the assistant superintendent say that the plaintiff, while coming up the aisle, was hitting cartridges against her rubber apron, and then heard the assistant superintendent tell the plaintiff she must not do this, for the cartridges were dangerous and might explode. The assistant superintendent testifies that, when she once saw the plaintiff throw the fuses carried by her from the filling room down on a table, she cautioned her of the danger of an explosion. Miss Reilly testifies that she had talked with the plaintiff before the

accident, and had told her to be careful; that the place was danger-
ous, and that she was led to do this because of a careless act of the
plaintiff. Almost all of these witnesses testify to the noise of the ex-
plosions from the biweekly tests, and it is shown that it was the prac-
tice to warn the employés before the tests, lest they be frightened by
the reports.

The plaintiff in rebuttal called several employés, who testified that
they had not been warned of the danger by Miss Hart, in order to dis-
credit her statement of her uniform practice; but their testimony was
rendered of little or no importance by their admissions that they were
not employed in any part of the work which brought them in contact
with the fuses. There is nothing suspicious in the testimony of the
various cautions administered to the plaintiff, if we believe that these
fellow servants realized the inherent danger of the work and under-
stood that any careless act of one of their number might imperil more
or less the safety of them all. So far as the testimony is concerned, the
plaintiff is outsworn on the question whether she was apprised of the
inherent danger by a great number of witnesses, some of whom were
her acquaintances of many years, and of whom all were her fellow
servants, testifying free from any apparent bias and out of any rela-
tion of employment with the defendant. Not only, to my mind, is
the story of such crass ignorance as the plaintiff testifies to incredible,
but, as I have shown, she is contradicted by many witnesses as to her
lack of warning or information. But, beyond all this, is it probable
that this superintendent and this assistant superintendent, whose con-
stant duty it was to walk about the room and to oversee the work,
would never have cautioned the plaintiff, would never have informed
her of the constant danger, if for no other reason than that of the
selfish prompting to save themselves from the extreme peril which at-
tended any careless or thoughtless act of the plaintiff, engaged in con-
stantly handling these cartridges charged with high explosives?

I now comment upon the different versions of the accident as they
have a bearing at least upon the credibility of the plaintiff. She testi-
fied that she was at her work, engaged in picking with her finger nail
the superfluous sulphur which had overflowed the protection of the
cap and the fastening of the wire, preparatory to dipping the cartridge
into the paraffine, when the cartridge exploded in her hand and caused
the other cartridges on the table to explode. She is corroborated by
two witnesses. Emily Sherdman, who was a boxmaker, says that she
was arranging boxes on the floor; that she was looking at the plain-
tiff, and saw her take one or two cartridges from those that she had in
her hands, and pick the sulphur from them, and then they exploded.
On cross-examination she testified that up to that time she had not
noticed for nine months how the particular work was done, but she
just happened to turn at this time to see what the plaintiff was doing;
that up to that time she had never had any time to spare; that she
suddenly wanted to know how plaintiff did her work, and so on this
occasion she watched particularly, while on all other occasions she did
not; that she looked this morning to be sure how the work was done,
and that at the time she was kneeling on the floor arranging the boxes.
The other witness was Jennie Block, who testified that she saw the

plaintiff coming down the aisle; that she had reached her table and was picking sulphur from the caps when the explosion occurred.

The superintendent, Miss Elizabeth Hart, testified that she did not see the accident happen, as she was out of the room for a short time; but she testifies that the witness Sherdman was not in that room, that she was quite sure of it, that she had no doubt about it, and that the boxes were made out in the machine shop. The witness Cannon testifies that she saw the plaintiff just before the accident; that she was doing a "cakewalk" with Miss Malore; that she was coming from the fillers with cartridges down the aisle, dancing, "doing the steps"; that cartridges were hanging by the wires on her arm. "I saw her just before she got to the table. Some one called out, 'Cheese it! here is Lizzie,' and Miss Malore went to her place, and Lottie went to the paraffine table and threw them violently on the paraffine pot, and then the explosion occurred." Mrs. Mary Owens was another employé. She testified that she saw the plaintiff as she was passing witness' table, and that she was doing a cakewalk with Miss Malore; "by the cakewalk I mean kind of a fancy walk, a sort of a high-stepping walk"; that the cartridges were hanging on her arm, but she did not see plaintiff at the time the accident happened; but that after she saw plaintiff walking down the accident happened, within a few seconds. Miss Malore testified that she and the plaintiff came down the aisle together, that they were "swinging a little, doing some pretty lively steps, steps that are used in a cakewalk," and the plaintiff had fuses on her arm; that she left quickly, went to her work, and almost immediately she heard the explosion. She says:

"We were simply young girls. I mean, when I say 'doing the cakewalk,' that we were stepping high and strutting down."

Now it was the business of the plaintiff, as she herself testified, to go and get these fuses and to bring them to her table. She says that Miss Hart walked up and down the room watching the girls filling the cartridges with sulphur. She was there most of the time watching them all. "Sometimes I would—as all young girls will that are full of life (sic)—I would like to chat, and go to balls and things of that kind the night before, and would like to chat about them the next day; and Miss Hart was there, so as not to have us give too much of our time to that sort of thing. * * * I had just come from the other end of the room." It may be here noted, referring to the slang expression, "Cheese it! here is Lizzie," that the first name of Miss Hart was Elizabeth.

There is no evidence as to any other injuries of the plaintiff. I do not assume to speak as an expert, and I know that the line of the trajectory in an explosion is not constant, but may be in aberration; but is it not likely that if the plaintiff held a cartridge in her hand at the time, and it exploded from the contact of her hand, there would have been some injury to her hand? Further, the plaintiff called an expert who testified that the cartridges were exploded normally by heat from the electricity; that one of these cartridges might be exploded in shaking off the paraffine, if you hit it against any metal or hard substance, because concussion alone would explode it; and that fulminate of mercury can be exploded by heat and by friction. He then

testifies that the fulminate inside of the cartridge might be exploded by friction produced by the hand rubbing over the cartridge to remove the sulphur, providing the plug was not tight, but if the plug was tight it could not happen; that it might be exploded by rubbing the finger nail over it if it was heated, or it might if there was a break in the shell and the fulminate was exposed. But it is quite evident that the natural method of explosion is by heat or concussion. The New International Encyclopedia says of fulminate of mercury:

"When moist it may be handled without much danger; but when dry it explodes with violence, if struck by a hard body or if heated."

Now the expert on cross-examination said that he had worked at this business, that he had never exploded fulminate of mercury by pouring sulphur into the shell, and that he had made the test over and over again. The operation of pouring the sulphur over the shell had been completed before the plaintiff took the cartridges from the filling girl. Therefore we may eliminate the heat, because, of course, she had to pick off the sulphur before she applied the paraffine.

There remains, then, but the theories of friction by the finger nail or concussion from throwing the cartridges down on the table where there were iron utensils and hard paraffine. Which is the more likely? The superintendent for the defendant, Clifton, testified that he examined the scene of the explosion, that there was a large hole blown in the top of the drip kettle, and that in his opinion as an expert the explosion was due to a blow on top of the hard paraffine, but that he knew nothing about this accident, save by examining the spot.

I have come to the conclusion that the verdict was against the weight of evidence to the extent that the appellate court cannot be satisfied with the judgment based upon it, and therefore, under the authority of McDonald v. Metropolitan St. Ry. Co., 167 N. Y. 66, 70, 60 N. E. 282, I think the judgment should be reversed, and that a new trial should be granted.

Judgment and order reversed, and new trial granted; costs to abide the event. All concur.

